IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JALESHA JOHNSON, LOUISE BEQUEAITH, BRAD PENNA, BRANDI RAMUS, AND HALEY JO DIKKERS,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN K. BAYENS, COMMISSIONER OF THE IOWA DEPARTMENT OF PUBLIC SAFETY, in his official and individual capacities, LIEUTENANT STEVE LAWRENCE, IOWA STATE PATROL DISTRICT 16 COMMANDER, in his official and individual capacities, SERGEANT TYSON UNDERWOOD, ASSISTANT DISTRICT 16 COMMANDER, in his individual capacity, IOWA STATE PATROL TROOPER DURK PEARSTON (BADGE NO. 168), in his individual capacity, and IOWA STATE PATROL TROOPER JOHN DOE #1, in his individual capacity,<br><br>Defendants. | Case No. 4:20-cv-00306<br><br><br><br>**DECLARATION OF DETECTIVE JEFFREY W. GEORGE** |

I, Jeffrey W. George, declare as follows:

1. I am over the age of 18 years. I have personal knowledge of all the facts set forth in this Declaration and would testify competently to those facts if called as a witness.

2. On July 1, 2020, I was working in my capacity as a Detective for the Des Moines Police Department. I was wearing my standard work attire, which consisted of dress pants, a tucked-in polo shirt with a Des Moines Police patch with "Investigations Division" embroidered on the chest. My Police badge was clearly visible on my belt and was positioned in front of my



holstered firearm on my right side. I was also wearing a body camera on my belt and had a handcuff and magazine pouch on my left side.

3. I had been contacted by Detective Brad Youngblut to assist him at the State Capitol with the apprehension of multiple individuals who either had active felony warrants or needed identified in order to face felony charges reference Des Moines Police case 20-16624. In that previous case, a DMPD squad car was severely damaged during a protest and Detective Youngblut had identified multiple suspects from the various security footage. Specifically, a female by the name of Jasmine Johnson (DOB 05/06/2001) was being sought. Johnson had been contacted by Detective Youngblut previously and had been requested to turn herself in for her active charges but had refused and was actively avoiding law enforcement. There were numerous other individuals who Detective Youngblut had photos of, but still needed to identify in order to file charges. These photos had been sent out in a Des Moines Police Intelligence bulletin.

4. Once at the Capitol, I met with Detective Youngblut, Detective Wilson, and multiple Iowa State Patrol Troopers who were providing security for a planned protest, The group protesting at the Capitol was the same group that had damaged the patrol vehicle under case 20-16624, and it was anticipated many of the individuals being sought would be present at the Capitol. As individuals began filtering into the Capitol building, Lashawn Winfield was observed and confirmed to be a person wanted under case 20-16624. Winfield confirmed he was the person in the photo, and he was placed under arrest without incident for Criminal Mischief 1st and taken to a nearby room in order to complete arrest paperwork. Due to the protestors coming in the west side of the Capitol, it was determined the police transport van come to the east side of the Capitol in order to avoid any unnecessary confrontation.

5. At this point, Detective Youngblut and I identified Aviva Jotzke who was another person sought in the bulletin. Contact was made with her in the hallway area and she was placed under arrest without incident. An attorney, Sally Frank, had identified herself as representing Jotzke and requested she accompany her to the holding area. I stood by as Detective Youngblut completed the arrest paperwork for Jotzke.

6. I was then notified by Detective Wilson that he had been informed Jasmine Johnson had been spotted within the Capitol. We were then informed by Troopers that Johnson had exited out of the west doors. Detective Wilson and I came outside onto the west terrace and I immediately observed Johnson standing near a group of individuals. As soon as Johnson observed Detective Wilson and I, who were also accompanied by a Trooper, she began walking away from us. Detective Wilson identified himself as a Des Moines Police Officer and to stop walking away from us at least six (6) times. However, Johnson continued to walk away to the south. Ultimately, Detective Wilson told her she would be arrested for interference if she did not stop walking away at which point, she did stop with her hands in the air. Johnson was asked for her name, however, she refused to speak to us, and another female stated that Johnson would not speak to us without a lawyer present. At that point, Detective Wilson and I confirmed that this female was in fact Jasmine Johnson via a photograph and detained her pending final confirmation.

7. At this time, Johnson became belligerent by yelling "do you have a warrant for my arrest?". This caused numerous other individuals to come over and begin yelling at us. I attempted to explain the situation to Johnson, however, she would only yell and refused to listen to anything I was saying. Detective Wilson and I then placed Johnson into handcuffs which she resisted by tensing up before we were able to put them on. Johnson was then escorted back into

3

the Capitol in order to go to the holding room where we could speak privately and process the arrest paperwork.

8. Johnson continued to yell while pushing against Detective Wilson and I, at which time I told her to stop resisting. Johnson then claimed that she was being held too tight while she continued to thrash back and forth, push back against us, and refuse to walk forward. Due to the passiveness of Johnson's resistance, I simply maintained control of her by using the area between my left thumb and index finger to prevent her from pushing back. Johnson claimed that I was holding her too tight, however, my fingers were straight out, and I was in fact not even gripping Johnson. The only pressure on Johnson's arm was from her pushing back against the crook of my left hand. Once again, I politely requested she stop resisting and tried to explain that she just needed to walk with us and stop pushing herself back into my hand, however, she continued to resist walking forward and was yelling far too much to be able to receive anything that I was saying.

9. During this time, there was a large group of protesters that we had to pass in order to get to the holding area. There was no other way to get to that room besides going past this main entry point. It became obvious that Johnson was yelling and putting on a performance in order to rile the group up. Ultimately, Johnson began walking forward once again. As we continued to walk to the holding area, multiple protesters began trying to block us with their bodies. One was a white female in a yellow shirt and the other was an individual whom I knew to be Matthew Bruce. Bruce was wearing shorts, a green t-shirt, black hat, and had a blue surgical mask on his face. Numerous Troopers were attempting to make a path for Detective Wilson and I to pass.

10. At this point, the Trooper directly in front of me was having to lightly push the people blocking us out of the way. One of those individuals was Matthew Bruce. Bruce then maneuvered himself directly in front of me, at which time he had his back to me and was physically using his left shoulder to push against me in an attempt to prevent me from walking forward while I was escorting Johnson to the holding area. Due to these reasons, I used my right arm to lightly push Bruce off of me. Bruce then stated, "Get your hands off me, ain't no one bothering your nigger". I found the racial slur that Matthew Bruce used to be highly offensive and completely uncalled for. At this point, I told Bruce "Stop pushing on me, sir" to which he replied, "You stop pushing on me". I then reiterated "Stop pushing on me, okay?" which Bruce replied, "You came into me to replace his (in reference to the Trooper) spot, so fuck you, I'm not the one for any of your bullshit". By this time, Bruce was on my right side as we approached the door to the holding room. I then told two other individuals "excuse me" as they were blocking my way into the holding room.

11. At this point, I was at the door to the holding room and my back was to the large group of people following us. A lot of yelling began so I turned to see what was going on and observed Matthew Bruce charge at myself and a Trooper, who was standing to my right, and physically push me into the room, which in turn caused me to push Jasmine Johnson into the room. Neither Johnson nor I were pushed to the ground but simply propelled into the room. The doors were immediately closed and Troopers on the exterior prevented the crowd from entering the room. Johnson then immediately became belligerent once again by yelling and screaming and making false claims that I had gripped her too hard. Johnson also stated that she was physically pushed through the door, which I confirmed because we had been bum rushed. I also explained to her that I had just prevented her from falling to the floor during that time as I did not want her

to get injured. At this point, she calmed down and Detective Youngblut was able to explain to her the arrest process.

12. Detective Wilson and I then escorted Aviva Jotzke outside to the transport van without incident. We met the wagon and Officer Dahlen in a nearby parking lot where custody of Jotzke was transferred to Officer Dahlen. At this point, we inquired if it was possible for the transport van to get closer to the Capitol steps to prevent issues with Jasmine Johnson being brought out, but it was found that the first parking lot outside of the east side of the Capitol was secured and that this was the closest the transport van could get. At this point, Detective Wilson and I returned to the Capitol building.

13. Once inside the building, Detective Wilson and I entered the holding room through an east door as there was still a large group protesting outside the west door. Detective Wilson and I explained to Jasmine Johnson that we were going to walk to the transport van and that we would appreciate it if she would just walk with us this time and not push and pull against us. Johnson did not reply but based on her body language she did not appear that she would resist, and she began walking on her own accord as we exited the east door of the holding room. There were a few Troopers outside the door, and they began walking with Detective Wilson and myself. As we exited the protesters observed Johnson and immediately came over to where we were walking.

14. Matthew Bruce and a female identified as Indria Sheumaker, who was wearing a black and white horizontal striped shirt and blue and white pants with a design on them, ran in front of the Troopers who were in front of me and began using their bodies to impede our movement outside. As we came to the door to the outside of the building Sheumaker ran in front of me and planted her body in an attempt to prevent my forward movement as I was escorting

Jasmine Johnson to the transport van. Sheumaker was told to "back up" as I used my arm to guide her out of my way at which point, she moved. As we continued to walk down the sidewalk the group was following us and chanting however, we had free movement as no one was in front of us during this time.

15. As we approached the bottom of the walkway and entrance to the parking lot, Matthew Bruce and Indria Sheumaker, as well as a few other individuals ran in front of us and began to use their bodies to impede our movement once again. Both were lightly guided back by Detective Wilson and me. At this point I had my left hand extended at arm's length distance in order to prevent Bruce from getting any closer to me and in order to maintain the ability to continue walking forward. During this time, Bruce was using his body weight to lean into my arm. Bruce then stated, "Yeah, you ain't doing that shit to me. Y'all can toss girls around real easy but I ain't see you toss me around". During this time Bruce was becoming more aggressive in his attempts to use his body to block our movement and began using his arms to physically push back into Detective Wilson and myself. I also observed that Bruce's left fist was balled up at points which is a common indication that someone is going to fight. I further explained to Bruce that "right now you're interfering in an arrest" to which he replied, "ain't nobody interfering with shit".

16. I then told Bruce to "back up" once again and he replied "fuck you, fuck you, fuck you" then pushed me with his right hand. By this time, Bruce had been told numerous times that he needed to back up, that he was interfering with an arrest, and had physically assaulted Detective Wilson, myself, and a Trooper inside the capitol by physically pushing us. Bruce was also substantially interfering with and preventing our movement of Johnson to the transport vehicle. Bruce was also becoming visibly more and more aggressive in his actions and I became

concerned that he would continue to further escalate his actions against officers. Due to these reasons, I told Bruce "Alright, you're going to jail" at which point, I grabbed Bruce's right wrist with my right hand in order to effect the arrest.

17. Bruce immediately pulled away from me and attempted to run in order to escape arrest. I maintained control over Bruce's right arm as he attempted to flee, however, the crowd immediately turned extremely violent. On video obtained from local news channel KCCI, who was filming nearby, Indria Sheumaker is observed coming from behind me as Bruce drug me to the ground causing my right elbow and knee to strike the curb causing minor abrasions along with pain and discomfort. At this point, an Asian male wearing a black T-shirt and black Adidas brand pants, later identified as Viet Tran, begins pulling on Bruce's left arm in order to prevent the arrest. As I hit the ground, Sheumaker used her left arm to begin choking me from behind. This caused my airflow to be restricted and placed me in a very reasonable threat of serious injury or death from strangulation. At this point, I was on the ground and still had partial control of Bruce who was now being pulled away from me by multiple individuals. Due to Sheumaker choking me, I was forced to release my grip on Bruce in order to address the serious threat of her cutting off my airflow. At this time, Detective Wilson had observed Sheumaker choking me and had pulled her off and attempted to place her into custody. During the initial assault against me and subsequent fight, my cell phone had fallen out of my pocket. Prior to getting up I felt two phones on the ground and retrieved both of them, as I assumed one of them was mine. I was later able to confirm I did recover my phone and another cell phone. I had also lost my radio during this time and was unaware of where it was.

18. By now pandemonium had broken out and there were numerous individuals assaulting law enforcement officers. As I stood up, I could see Matthew Bruce fighting with

multiple Troopers in front of me. As I looked back, I could see Detective Wilson attempting to get Sheumaker into custody while being assaulted and surrounded by a large group of people, so I went to assist him. As I went towards him, I observed my radio on the ground, so I retrieved it and called for emergency assistance. As I was calling for assistance, Sheumaker used her right leg to kick me as I was simultaneously pulled away by a white female wearing a lime green t-shirt and shorts, later identified as Jennifer Erwin. This created a separation between Detective Wilson, Sheumaker and I. Detective Wilson was stating multiple times to Sheumaker that she was under arrest as she was on her stomach and he was attempting to place her into handcuffs.

19. As I approached, I attempted to grab Sheumaker's right wrist in order to assist Detective Wilson with placing her into handcuffs but almost immediately an individual, later identified as Clayton Stein, a white male wearing a purple floral-patterned shirt, came up behind me and placed a rear naked choke hold around my neck. The choke hold was effective and caused me to have my airflow cut off and created a substantial risk of serious injury of death from lack of blood flow and oxygen. I immediately began to get out of the choke hold by rolling to my right side with the defendant on my back. Stein still had the choke hold around my neck, so I bit his right arm in order to get him to release the choke hold. Once I bit Stein, he did release the choke hold but then began punching the left side of my head as I felt my holstered handgun being pulled from its holster by Stein. At this point, I used my right hand to grab my loaded handgun, which at this point had been pulled from the holster. Once I grabbed the handgun, Stein released his grip and I regained positive control over it.

20. By this point, I had maneuvered myself to a position where I was now partially on top of Stein and he was on his back on the ground. I used my left hand to grab Stein's right arm and hold him down while he was attempting to kick me, I then altered my position, so I was now

straddling his legs. I ordered Stein multiple times to "Stop" and he eventually stopped his assault against me. I told Stein "I need to re-holster my weapon" as I held him down. Stein stated he could not breath even though I was not on top of his chest and there was no restriction to his airflow. Once my weapon was reholstered, I then told Stein to roll onto his stomach, however, he claimed he was unable to because I was holding his arm. At that time, I was able to roll Stein onto his stomach and place him into handcuffs. There was a female nearby who was yelling at me and calling me "a piece of shit" and stated she was Stein's girlfriend, Stein stated, "I'm her ride home so how is she getting home" at which time I told him "You should have thought about that before you punched me". Stein then began saying that I had been attacking someone and was "committing violence against someone so I committed violence against you". This was a clear admission to his actions of choking, punching, and attempting to disarm me.

21.   At this point, Officer Gallardo was next to me and Stein was stood up. Officer Gallardo took control of Stein and escorted him to the transport van as I retrieved my radio which had once again fallen out of my pocket. I then went to the transport van in order to identify Stein. His girlfriend was also at the wagon and was demanding his car keys which Stein stated she could have. I asked for the female's name and date of birth in order to document who the property would be going to. The female stated her name was Olivia Smith but refused to give her date of birth. As she was requesting property from a prisoner, I did not feel comfortable giving personal property away to a person whose identity was unconfirmed. Stein was then placed into the wagon and maintained his keys.

22.   At this time, I returned to the grassy area where numerous officers were now present. I observed that my holster had been broken during Stein's assault against me. I began to formulate a plan to get prisoners out of the scene and to the police station in order to prevent

additional confrontation. I was also informed that Matthew Bruce had been arrested and was inside a transport van. As I checked my person, I realized that I had picked up a cell phone that did not belong to me during the fight. This was presumably when I went to retrieve my phone that had fallen out.

23. I then approached Officer Jamie Quinn's vehicle as there was a female prisoner inside of it. The prisoner was Indria Sheumaker. However, I did not know her identity at the time. Sheumaker was asking for her phone, so I showed her the phone I found, however, she stated it was not hers. I informed her I would be placing it on property at the station. At this point, I was attempting to walk her to the transport van and asked if she was going to cause any problems. She stated, "I don't know", and "what if I do". Due to Sheumaker's comments and to avoid any further issues with Sheumaker, I decided to drive her in the patrol vehicle across the grass to the transport van. Sheumaker was taken to the transport van, however, the female compartment was full, so she needed to go back to the patrol vehicle. Sheumaker was still being belligerent and yelling about who had her phone and stated that she thought one of the protesters may have her phone. Ultimately, Sheumaker did get back into the patrol vehicle at which point I ensured the air conditioning was on and the prisoner compartment fan was running so she would not get overheated.

24. Prior to my departure from the Capitol, I was informed by Iowa State Patrol Sergeant Durk Pearston #168, that he had ultimately arrested Matthew Bruce and that Bruce had kicked him in his leg while Sergeant Durk was effecting the arrest.

25. At this point, I returned to the station in order to begin paperwork. Once at the station, the arrestees were placed into the roll call room for an easier and expedited booking process. Upon entry into the roll call room, I reactivated my body camera. I then observed

Clayton Stein. Officer Cuppy had begun filling out his booking sheet, but since I was the arresting officer, I informed Officer Cuppy I could fill the rest of the paperwork out. While there, arrest incident photos were taken of me, Matthew Bruce, Clayton Stein, and Indria Sheumaker. At one point while in the roll call room, I did leave my body camera on a table in order to speak with Sergeant Nicolino about charging decisions regarding the arrestees. It should be noted at the 12:20 mark in Officer Cuppy's body camera, I am explaining to Sergeant Nicolino what occurred and how I was attacked from behind by someone, at which point Stein made a voluntary statement stating, "That'd be me". This was yet another admission to his assault.

26. At this point, I returned to my office and was made aware of various social media videos that had been posted to either Facebook or Twitter. I observed a video on Sheri Faye Rosendahl's Facebook account and began recording it, however, it was soon taken down. Detective Darrin Miller did capture two videos from social media which were forwarded to me. They were uploaded to Watchguard as evidence. The videos show different angles of the assaults on police and are extremely beneficial to this investigation. Various news outlets also posted video of the assaults on police. In a full video taken by KCCI, Matthew Bruce is observed being placed into the transport van and yells to his supporters "way to make them work" in reference to violently assaulting police officers. Upon seeing Clayton Stein at the transport van, Bruce can be heard telling Stein "Way to fight, good shit, good shit, give them hell, give them hell all day" to which Stein smiles and replies "thank you brother". It is obvious from these comments that neither Stein or Bruce were remorseful in anyway about their actions; in fact, they are quite proud of their assaults and criminal behavior.

27. Over the course of the following week my right elbow and knee were sore. My neck was very sore from the two choke holds that I was placed in and I was coughing for

approximately three days after the assault as a result of my throat being compressed during the chokes. My gun holster was broken at the bracket and I have had to purchase a new one with my own money. The replacement cost is approximately $90.00.

I certify under penalty of perjury and pursuant to the laws of the state of Iowa that the preceding is true and correct.

Executed this 27th day of OCTOBER, 2020.

_____
Jeffrey W. George