IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JALESHA JOHNSON; LOUISE BEQUEAITH; BRAD PENNA; BRANDI RAMUS; and HALEY JO DIKKERS, <br><br>      Plaintiffs, <br><br> v. <br><br> STEPHAN K. BAYENS, COMMISSIONER OF THE IOWA DEPARTMENT OF PUBLIC SAFETY, in his official and individual capacities; LIEUTENANT STEVE LAWRENCE, IOWA STATE PATROL DISTRICT 16 COMMANDER, in his official and individual capacities; SERGEANT TYSON UNDERWOOD, ASSISTANT DISTRICT 16 COMMANDER, in his individual capacity; IOWA STATE PATROL TROOPER DURK PEARSTON, in his individual capacity; and IOWA STATE PATROL TROOPER JOHN DOE #1, in his individual capacity, <br><br>      Defendants. | **No. 4:20-cv-00306-RGE-CFB** <br><br><br> **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## I.    INTRODUCTION

Plaintiffs Jalesha Johnson, Louise Bequeaith, Brad Penna, Brandi Ramus, and Haley Jo

Dikkers bring federal civil rights claims against Defendants Stephan K. Bayens, Commissioner of

the Iowa Department of Public Safety; Lieutenant Steve Lawrence, Iowa State Patrol District 16

Commander; Sergeant Tyson Underwood, Assistant District 16 Commander; Iowa State Patrol

Trooper Durk Pearston; and Iowa State Patrol Trooper John Doe #1. Plaintiffs file suit under

42 U.S.C. § 1983, alleging Defendants violated their rights under the First, Fifth, Ninth, and

Fourteenth Amendments to the Constitution by banning Plaintiffs from the Iowa State Capitol and

Capitol Complex grounds for periods ranging from six months to one year. Plaintiffs move for a preliminary injunction to stop enforcement of the bans. For the reasons set forth below, the Court grants Plaintiffs' motion.

## II.   FINDINGS OF FACT

The limited purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[H]aste . . . is often necessary if those positions are to be preserved." *Id.* As a result, the Court's decision to grant or deny an injunction rests on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, the Court's findings of fact and conclusions of law in this Order are not binding at trial. *See id.*

The parties did not request a hearing. The Court did not hold a hearing. The following facts are derived from the parties' affidavits and exhibits. *See* Johnson Decl., ECF No. 2-2; Pls.' Ex. A Supp. Johnson Decl., ECF No. 2-2 at 8; Bequeaith Decl., ECF No. 2-3; Pls.' Ex. A Supp. Bequeaith Decl., ECF No. 2-3 at 7; Penna Decl., ECF No. 2-4; Ramus Decl., ECF No. 2-5; Pls.' Exs. A–D Supp. Ramus Decl., ECF No. 2-4 at 9–31; Dikkers Decl., ECF No. 2-6; Pls.' Ex. A Supp. Dikkers Decl., ECF No. 2-6 at 7; George Decl., ECF No. 11-2; Underwood Decl., ECF No. 11-3; Defs.' Ex. 3 Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-4 (Video 1 – YouTube Clip); Defs.' Ex. 4 Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-5 (Video 2 – Cell Phone Clip); Defs.' Ex. 5 Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-6 (Video 3 – Iowa State Patrol Clip); Defs.' Ex. 6 Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-7 (Video 4 – Trim Clip); Defs.' Exs. 7–11 Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-8 to 11-12 (Des Moines Police Department complaints against Plaintiffs on July 1, 2020); Pls.' Ex. A Supp. Reply Mot. Prelim. Inj., ECF No. 14-1 (Johnson Order of Dismissal in Iowa District Court for Polk County); Pls.' Ex. B Supp. Reply Mot. Prelim. Inj., ECF No. 14-2 (Ramus Order of Dismissal in Iowa District Court for Polk County).

On July 1, 2020, Des Moines Police Department detectives went to the Iowa State Capitol to search for individuals suspected of engaging in violent acts during a prior protest in downtown Des Moines. ECF No. 11-2 ¶¶ 3–4; *see also* ECF No. 11-3 ¶¶ 3–4. The detectives anticipated the individuals for whom arrest warrants had been issued would be participating in a protest at the Capitol organized by the Des Moines Black Liberation Movement. ECF No. 11-2 ¶ 4; *see* ECF No. 2-2 ¶ 10.

After the detectives arrived, they identified three individuals with outstanding arrest warrants. ECF No. 11-2 ¶¶ 4–7; ECF No. 11-3 ¶ 5. The detectives arrested the individuals and escorted them to a secure room within the Capitol. *Id.* A large group of protestors began gathering around the secure room. ECF No. 11-2 ¶ 9; ECF No. 11-3 ¶ 5.

After completing initial arrest paperwork, the detectives escorted the arrestees from the secure room to the transport vehicle. ECF No. 11-3 ¶¶ 5, 7. The first two arrestees were escorted to the transport vehicle without incident. *See* ECF No. 11-2 ¶¶ 4, 12. When the third arrestee was escorted out, the crowd of protestors that had gathered outside the secure room surrounded the detectives as they walked out of the Capitol. *See id.* ¶¶ 13–15; ECF No. 11-4 at 00:00–00:45. Plaintiffs were in the group of protestors surrounding the law enforcement officers as officers attempted to reach the transport vehicle. *See* ECF No. 2-2 ¶ 11; ECF No. 2-3 ¶ 10; ECF No. 2-4 ¶ 5; ECF No. 2-5 ¶ 11; ECF No. 2-6 ¶ 8.

Before the officers could reach the transport vehicle, the interactions between the protestors and the law enforcement officers changed. *See* ECF No. 11-4 at 01:45–02:35; ECF No. 11-7 at 01:38–03:15. Law enforcement officers attempted to arrest a member of the crowd they believed was interfering with their escort of the third arrestee. ECF No. 11-3 ¶¶ 8–10. Videos of the scene depict chaos as protestors jumped on top of the law enforcement officers who were attempting to arrest other protestors the officers believed were interfering with the transport of the third arrestee.

3

*See* ECF No. 11-4 at 01:45–02:35; ECF No. 11-7 at 01:38–03:15. As he exited the Capitol, Sergeant Underwood witnessed protestors assaulting law enforcement officers. ECF No. 11-3 ¶ 8. The individuals arrested were placed in the transport vehicle and taken to the Des Moines Police Department for further processing. *Id.* Plaintiffs were among the protestors arrested. ECF No. 2-2 ¶¶ 13–14; ECF No. 2-3 ¶¶ 13–15; ECF No. 2-4 ¶¶ 7–8, 10; ECF No. 2-5 ¶¶ 15–17; ECF No. 2-6 ¶¶ 11–12.

Leaders of the Iowa Legislature convened later that same day, to discuss these events. *See* ECF No. 11-3 ¶ 11. Legislative Leadership requested the Iowa State Patrol notify those individuals taken into custody that they were banned from the Capitol Complex grounds for a period of six months. *Id.* Sometime after the transport vehicles arrived at the Des Moines Police Station, Johnson and Bequeaith allege an Iowa State Patrol Trooper, John Doe #1, orally notified them that they were banned from the Capitol for one year—until July 1, 2021. ECF No. 1 ¶ 19; ECF No. 2-2 ¶ 16; ECF No. 2-3 ¶¶ 16–17. Ramus, Penna, and Dikkers allege Trooper Pearston orally notified them that they were banned from the Iowa Capitol Complex for six months—until January 1, 2021. ECF No. 1 ¶¶ 10–12; *see* ECF No. 2-4 ¶ 11; ECF No. 2-5 ¶ 19; ECF No. 2-6 ¶ 14. In total, seventeen protestors, including Plaintiffs, were banned from the Capitol and Capitol Complex grounds. ECF No. 1 ¶ 1.

Two weeks after their arrest, Bequeaith, Ramus, and Dikkers received letters dated July 15, 2020, stating:

> As a result of your actions and/or behavior toward citizen(s) and/or employee(s) of the State of Iowa on July 1st, 2020, any continued and future presence on or about the property after the date of this letter will not be welcome or tolerated. Pursuant to Section 716.8(1) of the Iowa Code, you are hereby notified that you are to abstain from entering upon any portion(s) of the property known as 1007 East Grand Avenue, Des Moines, IA 50319 including yards, parking areas, state owned streets and sidewalks, and all state owned facilities within the Capitol Complex grounds. Be advised that your entry upon any portion of the property after receiving this notice will constitute trespass, a criminal offense, and it will be reported to law

enforcement for criminal prosecution.

This admonition is continuing and perpetual until January 1st, 2021, and cannot be withdrawn prior to January 1st, 2021, except in writing by the Iowa Legislative Leadership or other future management staff. Please govern yourself accordingly.

Pls.' Ex. A Supp. Bequeaith Decl., ECF No. 2-3 at 7; Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9; Pls.' Ex. A Supp. Dikkers Decl., ECF No. 2-6 at 7.[1] The letters did not identify the members of the "Iowa Legislative Leadership." *See id.*; *see also* Pls.' Ex. D Supp. Ramus Decl., ECF No. 2-5 at 12–31 (emails to Iowa legislature members attempting to identify which legislators decided to issue bans). The letters were on Bayens's letterhead and were signed by Sergeant Underwood. *See* Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9.

Johnson, Ramus, and Dikkers were cited for interference with official acts under Iowa Code § 719.1(1)(B). ECF Nos. 11-8, 11-11 to 11-12. Bequeaith was cited for disorderly conduct under Iowa Code § 723.4(1). ECF No. 11-9. Penna was cited for assault on persons in certain occupations under Iowa Code § 708.3A(3). ECF No. 11-10. On October 5, 2020, the Iowa District Court for Polk County dismissed the cases against Johnson and Ramus. ECF Nos. 14-1 to 14-2. The criminal cases against the other Plaintiffs remain pending.[2]

Additional facts are set forth below as necessary.

---

[1] The Court notes a minor difference in the letters received by Ramus and Dikkers as compared to the letter received by Bequeaith. Ramus's and Dikkers's letters state "any portion(s) of the property known as 1007 East Grand Avenue." Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9; Pls.' Ex. A Supp. Dikkers Decl., ECF No. 2-6 at 7. Bequeaith's letter states "any portion of the property known as 1007 East Grand Avenue." Pls.' Ex. A Supp. Bequeaith Decl., ECF No. 2-3 at 7. For ease of reference, the Court cites to Ramus's letter when discussing the written bans. The Court cites to the oral and written bans as to the Plaintiffs collectively as "the bans."

[2] The Court takes judicial notice of following cases: *State v. Bequeaith*, No. SMAC389281 (Iowa Dist. Ct. Polk Cty.); *State v. Penna*, No. AGCR339613 (Iowa Dist. Ct. Polk Cty.); and *State v. Dikkers*, No. SMAC389283 (Iowa Dist. Ct. Polk Cty.). *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (federal courts "may take judicial notice of judicial opinions and public records").

## III.    PROCEDURAL POSTURE

On October 5, 2020, Plaintiffs filed a seven-count complaint against Defendants, alleging claims under 42 U.S.C. § 1983. Compl., ECF No. 1. Plaintiffs allege the bans prohibiting their entry to the Capitol and Capitol Complex grounds: constitute a prior restraint in violation of their First, Fifth, and Fourteenth Amendment rights (Count I); violate their right to freedom of speech under the First and Fourteenth Amendments (Count II); violate their right to peaceful assembly under the First and Fourteenth Amendments (Count III); violate their right to petition their state government for redress of grievances under the First and Fourteenth Amendments (Count IV); violate their right to freedom of movement and substantive due process under the Fifth, Ninth, and Fourteenth Amendments (Count V); violate their right to procedural due process under the Fifth and Fourteenth Amendments (Count VI); and constitute retaliation for Plaintiffs' exercise of constitutional rights under the First Amendment (Count VII). *Id.* ¶¶ 86–107.

Plaintiffs also filed a motion for a preliminary injunction to stop the enforcement of the bans. ECF No. 2. Defendants oppose Plaintiffs' motion. ECF No. 11; *see* Defs.' Br. Supp. Resist. Pls.' Mot. Prelim. Inj., ECF No. 11-1. The parties did not request an evidentiary hearing or oral argument, and the Court declines to order one, finding the parties' briefing and submitted exhibits adequately present the issues. *See* Fed. R. Civ. P. 78(b); Fed. R. Civ. P. 65; LR 7(c).

## IV.    LEGAL STANDARD

Plaintiffs seek an injunction under Federal Rule of Civil Procedure 65(a). *See* ECF No. 2 at 1. "The party seeking a preliminary injunction bears the burden of establishing the necessity of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). To decide if a movant satisfies this burden, a court considers the four *Dataphase* factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability

that the moving party will succeed on the merits; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* factors are not applied as a "rigid formula." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987). Although "'no single factor is determinative,'" likelihood of success on the merits is "the most significant" factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[T]he burden on the movant is heavy, in particular where . . . 'granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (second alteration in original) (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993)). Ultimately, a court "has broad discretion when ruling on requests for preliminary injunctions." *Id.*

## V.    DISCUSSION

Plaintiffs seek an order preliminarily enjoining Defendants from enforcing bans prohibiting Plaintiffs' entry to the Capitol and Capitol Complex. Pls.' Br. Supp. Mot. Prelim. Inj. 2, ECF No. 2-1. After considering the *Dataphase* factors, the Court concludes a preliminary injunction is warranted.

### A.    Likelihood of Success on the Merits

The Court analyzes the likelihood of success on the merits first, as it is the "most significant" factor. *Home Instead*, 721 F.3d at 497. To determine the likelihood of success on the

merits, a court assesses whether the plaintiffs have a "fair chance" of prevailing. *Planned Parenthood v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc); *see also Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam) (discussing the likelihood of success on the merits factor). In doing so, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo." *United Indus.*, 140 F.3d at 1179 (quoting *Calvin Klein Cosmetics*, 815 F.2d at 503). Plaintiffs only need to be likely to succeed on one of their multiple claims to warrant issuance of a preliminary injunction. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016).

### 1.    Prior restraint

In Count I of their complaint, Plaintiffs allege the bans are a prior restraint on Plaintiffs' First Amendment rights. ECF No. 1 ¶¶ 86–89; ECF No. 2-1 at 3–4. Plaintiffs argue the bans cannot overcome the strict scrutiny standard of review applied to prior restraints. ECF No. 2-1 at 3–16. Defendants contend the bans are not a prior restraint because they were not issued to prohibit future speech or deny access to the Capitol Complex grounds on the basis of Plaintiffs' future speech. ECF No. 11-1 at 7–8. Defendants argue any incidental effect the bans have on Plaintiffs' First Amendment rights does not make the bans unconstitutional. *Id.* at 8–10. The Court finds Plaintiffs fail to show a likelihood of success on their prior restraint claims.

"The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation marks and citation omitted). In order to prevail on Count I, Plaintiffs must show: the bans constitute a prior restraint, the bans do not "fit within one of the narrowly defined exceptions to the prohibition

against prior restraints," and procedural safeguards were lacking. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The Court first considers whether the bans constitute a prior restraint. The Supreme Court has examined several cases where it deemed official acts that had a "censoring effect" on a plaintiff's proposed speech or expressive conduct constituted a prior restraint. *Id.* at 552–53 (collecting cases). "In these cases, the plaintiffs asked the courts to provide relief where public officials had forbidden the plaintiffs the use of public places to say what they wanted to say." *Id.* at 553. In each case, the statute at issue gave officials the power to "deny use of a forum in advance of actual expression." *Id.* However, the Supreme Court has long distinguished prior restraints from subsequent punishments. *Alexander*, 509 U.S. at 553–54.

The Supreme Court examined the distinction between prior restraints and subsequent punishments in *Alexander*. There, the Supreme Court analyzed the prohibitive effects of a forfeiture order under the Racketeer Influenced and Corrupt Organizations Act (RICO). *See id.* The petitioner claimed the financial effects of the RICO forfeiture order caused the shuttering of his adult entertainment business and thus operated as a prior restraint on the future publication of expressive material. *Id.* at 549. The Supreme Court distinguished the forfeiture order from other cases where anticipated communications were forbidden based on the content or medium of the proposed speech. *Id.* at 550 (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 706 (1931); *Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980)). The Court noted the latter prohibitions were "true restraint[s] on future speech." *Id.* The Court determined the forfeiture order was not a prior restraint, but a subsequent punishment. It reasoned the forfeiture order was issued because of petitioner's violation of a statute that was "oblivious to the expressive or nonexpressive nature of the assets forfeited." *Id.* at 551, 554.

The subsequent punishment present in *Alexander* is readily distinguishable from the prior restraint in *Southeastern Promotions*. *Compare id.* at 550–552, *with Se. Promotions*, 420 U.S. at 552–54. In *Southeastern Promotions*, the Court examined theater directors' discretion to deny a musical production company access to a municipal theater on the basis of the proposed musical's content. *Se. Productions*, 420 U.S. at 547–48, 552–55. The Court recognized the directors denied the production company's use of the theater before any expressive activity ever occurred; they did not act post-production to deny future expressive activity. *Id.* at 555. Thus, the directors' acts imposed an unconstitutional prior restraint on the production company's First Amendment expression. *Id.* at 554–55.

Here, Defendants implemented the bans at issue in response to alleged unlawful conduct, not based upon Plaintiffs' anticipated future speech. *See* Pl.'s Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9 (citing "actions and/or behavior towards citizen(s) and/or employee(s) of the State of Iowa" on July 1, 2020, as the reason for the ban); *cf. Alexander*, 509 U.S. at 553–54 (determining the forfeiture order was a sanction for unlawful conduct and not a prior restraint). Defendants did not forbid Plaintiffs' use of the Capitol and Capitol Complex grounds to keep them from "say[ing] what they want[ ] to say." *Id.* at 553. Unlike in *Southeastern Promotions*, Defendants did not institute bans based on Plaintiffs' proposed expressive activity. *Cf. id.* at 554–55. Rather, law enforcement officers arrested Plaintiffs based on probable cause they interfered with law enforcement duties in violation of Iowa law. *See* ECF No. 11-3 ¶¶ 7–11. The bans here—in substance and form—were imposed in response to conduct unrelated to speech. *See id.* ¶ 11 ("Legislative leadership decided such lawlessness and violence against law enforcement could not be tolerated."). The issuance of the bans was not related to advance consideration of speech yet to occur. This feature places the bans in the category of subsequent punishments and differentiates them from prior restraints. *Cf. Alexander*, 509 U.S. at 553–54.

The Court finds the bans are unlikely to be considered a prior restraint. Therefore, the Court need not inquire as to the other two parts of the prior restraint analysis—whether the restrictions fit within the narrow exceptions to a prior restraint or if appropriate procedural safeguards were implemented. Plaintiffs are unable to establish the likelihood of success on the merits of their prior restraint claims in Count I.

### 2.    Violation of First Amendment rights

Because Plaintiffs "need only establish a likelihood of succeeding on the merits of any one of [their] claims," the Court considers whether Plaintiffs are likely to succeed on their First and Fourteenth Amendment claims alleged in Count II. *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1040 (internal quotation marks and citation omitted). Plaintiffs contend the bans are unconstitutional regulations of speech in a traditional public forum. *See* ECF No. 1 ¶¶ 90–92.

 "[T]raditional public fora are areas that have historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 476–77 (2014). "[M]embers of the public retain strong free speech rights when they venture into public streets and parks, 'which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Perry Ed. Assn. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). "Reasonable time, place, and manner restrictions are allowed, but any restriction based on the content of the speech must satisfy strict scrutiny." *Id.* (internal citation omitted). However, even where a regulation does not address speech on its face, it is nevertheless subject to First Amendment scrutiny if it restricts access to a traditional public forum. *McCullen*, 573 U.S. at 476–77.

The challenged bans have the effect of regulating the manner of Plaintiffs' exercise of First Amendment rights in the Capitol and on the Capitol Complex grounds, traditional public fora. The

Court first considers whether the bans are content-neutral:

> The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks and citations omitted).

The written bans do not mention Plaintiffs' expressive conduct. *See* Pl.'s Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9. Instead, the bans focus on Plaintiffs' conduct "toward citizen(s) and/or employee(s) of the State of Iowa." *See id.* Thus, the bans are facially unrelated to Plaintiffs' speech activities. *Cf. McCullen*, 573 U.S. at 479 ("[T]he Act would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." (internal quotation marks and citation omitted)). Because the bans are facially unrelated to speech activities, the Court considers legislators' purpose in instituting the bans to determine whether the bans are content-neutral. *See Ward*, 491 U.S. at 791. The Legislative Leadership instituted the bans in response to the violent, assaultive conduct toward law enforcement on July 1, 2020. ECF No. 11-3 ¶ 11. Defendants argue the bans "were issued for the purpose of public safety" and to deter future violence. ECF No. 11-1 at 9, 14. The "need to protect . . . [building] security" has been identified as a content-neutral concern. *McCullen*, 573 U.S. at 480 (alteration in original) (internal quotation marks omitted) (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). For these reasons, the Court finds the bans are content-neutral.

The Court next determines the standard of scrutiny to apply to the bans. The United States Supreme Court has distinguished the levels of scrutiny applied to different kinds of content-neutral restrictions. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994) ("There are

obvious differences, however, between an injunction and a generally appliable ordinance. Ordinances represent a legislative choice regarding . . . societal interests. Injunctions . . . are remedies imposed for violations."). For generally applicable laws and ordinances, content-neutral time, place, or manner restrictions of speech in a public forum are permissible if "they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). However, for content-neutral injunctions that effectively restrict the speech of a particular group, the Supreme Court has determined the "standard time, place, and manner analysis is not sufficiently rigorous." *Madsen*, 512 U.S. at 765. When considering such restrictions, courts "ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Id.*

In *Madsen*, the Supreme Court applied this more stringent standard in analyzing a content-neutral injunction restricting the speech of antiabortion protestors. *Id.* at 757–76. The injunction prohibited protesters from demonstrating "in certain places and in various ways outside of a health clinic that performs abortions." *Id.* at 757. The Court recognized "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances," but they also have the advantage of being "tailored . . . to afford more precise relief than a statute." *Id.* at 764–65. Thus, the Court determined a "somewhat more stringent application of general First Amendment principles" should be applied to injunctions. *Id.* at 765. The Court considered whether the injunction burdened more speech than necessary to serve the significant government interests of public safety and order. *Id.* at 768–76. The Court concluded several features of the injunction burdened more speech than necessary to achieve the significant state interests, including: extending a thirty-six-foot buffer zone beyond clinic entrances and the parking lot to private property, banning all observable images, prohibiting approaching any clinic patients within

13

300 feet of a clinic, and instituting a blanket-ban on picketing. *Id.*

In contrast, in *McCullen*, the Supreme Court examined a generally applicable statute imposing a time, place, or manner restrictions on First Amendment conduct. 573 U.S. at 469–97. The Massachusetts statute at issue in *McCullen* regulated access to public sidewalks and walkways outside clinics that performed abortions. *Id.* at 471–72. The Court applied intermediate scrutiny to the content-neutral statute. *See id.* at 486 ("Even though the [statute] is content neutral, it still must be 'narrowly tailored to serve a significant governmental interest.'" (quoting *Ward*, 491 U.S. at 796)). In analyzing whether the statute was narrowly tailored, the Court recognized the statutorily mandated buffer zones imposed serious burdens on the petitioners' speech because they were no longer able to engage in "sidewalk counseling" or distribute literature to patients as they walked into the clinics. *Id.* at 487–89. Ultimately, the Court found the buffer zones burdened substantially more speech than necessary to achieve the State's interests. *Id.* at 490. The Court reasoned, in part, the State's asserted interests of ensuring public safety and preventing harassment and intimidation were already prohibited by a separate provision of the statute. *Id.* at 490–91. The Court acknowledged that Massachusetts could consider enacting additional regulations if more prohibitions were necessary. *Id.* at 490. The Court reasoned, "The point is . . . that the Commonwealth has available to it a variety of approaches that appear capable of serving its interest, without excluding individuals from areas historically open for speech and debate." *Id.* at 493–94.

The bans at issue are neither a court-ordered injunction, like that in *Madsen*, nor a generally applicable ordinance, like that in *McCullen*. However, the features of the bans more closely align with those of a content-neutral injunction, as discussed in *Madsen*. Though not issued by judicial decree, the bans enjoin a particular group of people from engaging in specific conduct. *See Madsen*, 512 U.S. at 762 ("An injunction, by its very nature, applies only to a particular group

(or individuals) and regulates the activities, and perhaps the speech, of that group."). Thus, the Court applies the more "rigorous" standard to the bans as outlined in *Madsen*, and asks whether they "burden no more speech than necessary to serve a significant government interest." *Id.* at 765. Though the Court applies the more stringent standard, it also looks to the narrow tailoring analysis in *McCullen*—particularly for its focus on the extent of the speech burdened by a statute. *See* 573 U.S. at 490–94. The Supreme Court's reasoning in *McCullen* is consistent with the standard set forth in *Madsen* and is instructive of the Court's analysis of the bans at issue here. *See* 512 U.S. at 765.

For Plaintiffs to succeed on their claims in Count II, the challenged bans must not burden more speech than is necessary to serve significant government interests. *See Madsen*, 512 U.S. at 765. "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968). Thus, "the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency." *McCullen*, 573 U.S. at 486 (second alteration in original) (internal quotation marks omitted) (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

The Court recognizes Defendants maintain a long-recognized, legitimate interest in public safety and order. *See, e.g.*, *Boos*, 485 U.S. at 321; *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 375–76 (1997); *Madsen*, 512 U.S. at 767–68. There is also a legitimate interest in preventing harm to law enforcement officers, allowing other nonviolent protests to occur, and keeping the Capitol and Capitol Complex grounds safe for Iowans to petition their State

government. When considering these significant interests in light of the speech burdened, the Court finds several features of the bans at issue indicate they likely burden more speech than is necessary to serve these significant interests.

First, the scope of the bans is broad. The bans completely prohibit Plaintiffs from exercising their First Amendment rights in the Capitol and on the Capitol Complex grounds. *See* Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9. One cannot speak where one cannot enter. The bans go beyond the Capitol building to include the sidewalks and streets within the Capitol Complex grounds. *Cf. Wright v. City of St. Petersburg, Fl.*, 833 F.3d 1291, 1297 (11th Cir. 2016) (explaining the incidental burden on speech "was mitigated by the fact that the ordinance allowed [plaintiff] to enter the sidewalks" around the park); *see also Madsen*, 512 U.S. at 773–75 (concluding blanket bans on observable images, picketing, and approaching patients within 300 feet of the clinic burdened more speech than necessary). Second, although these restrictions are limited in time to six months or one year, they provide no exception within that time period for First Amendment expression. *Cf. Wright*, 833 F.3d at 1298 (recognizing the ordinance at issue allowed plaintiff to apply to suspend his park-entry ban to engage in First Amendment activities). Third, the bans also provide no information as to whether Plaintiffs can appeal the bans. *See* Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9. Nor do they identify any process by which Plaintiffs can seek permission to exercise their First Amendment rights. *See id.* The bans state revocation can occur only in writing by the "Legislative Leadership." *See id.* However, the bans do not identify the decision makers or outline a process for Plaintiffs to pursue such a revocation. *See id.*; *see also* Pls.' Ex. D Supp. Ramus Decl., ECF No. 2-5 at 12–31 (emails to members of the Iowa Legislature attempting to identify the decision makers). Finally, the written bans cite Plaintiffs' conduct generally but do not specifically identify the conduct necessitating the bans or provide information as to the factual basis for finding that Plaintiffs engaged in the alleged conduct

16

warranting the bans. *See, e.g.*, Pls.' Ex. A Supp. Ramus Decl., ECF No. 2-5 at 9.

The Court also notes the bans do not indicate the authority under which the Legislative Leadership acts in instituting the bans. The bans cite to Iowa Code § 716.8(1), which is the statute outlining the penalties for criminal trespass. In their response to the motion for preliminary injunction, Defendants cite to 11 Iowa Administrative Code Chapter 100.2(3). *See* ECF No. 11-1 at 12. This rule tasks the Iowa Department of Administrative Services and Department of Public Safety with taking "reasonable and appropriate measures to ensure the safety of persons and property on the capitol complex." Iowa Admin. Code r. 11-100.2(3). A violation of rule 100.2(3) "may result in the denial of access to a state building . . . or expulsion from the grounds of the capitol complex . . . ." Iowa Admin. Code r. 11-100.2(3). However, the bans at issue deny Plaintiffs' access to more than just a state building and go beyond an immediate expulsion. Moreover, it is unclear Plaintiffs violated a specific provision of the rule. *See id.* (listing, for example, measures limiting access to state buildings to selected entrances, limiting hours for public access to state buildings, and confiscating containers). Plaintiffs are prohibited "from entering upon any portion(s) of the property known as 1007 East Grand Avenue, Des Moines, IA 50319 including yards, parking areas, state owned streets and sidewalks, and all state owned facilities within the Capitol Complex grounds." *See* Pls.' Ex. A Supp. Johnson Decl., ECF No. 2-2 at 8. This area spans several city blocks. To the extent rule 100.2(3) authorizes issuance of a ban under these facts, the bans appear to exceed that authority.

The Supreme Court has upheld content-neutral time, place, and manner restrictions that did not prevent the entirety of First Amendment expression. In *Clark v Community for Creative Non-Violence*, the Supreme Court determined the prohibition against demonstrators camping in Washington D.C.'s Lafayette Park and on the National Mall was a narrowly tailored, content-neutral, time, place, or manner restriction that furthered the Government's substantial

interest in park maintenance. 468 U.S. at 296–98. The Court reasoned, in part, that the prohibition was not so broad it prevented all expressive activity, but only the manner of the demonstration. *Id.* In *Madsen*, the Supreme Court analyzed several features of an injunction imposing complete prohibitions on some forms of First Amendment conduct. 512 U.S. at 768–76. In *McCullen*, the Supreme Court recognized the breadth of speech burdened by buffer zones imposed by a Massachusetts statute. 573 U.S. at 490–92. The breadth of speech burdened here is similar to that in *McCullen* and *Madsen*. The bans here preclude all First Amendment conduct in the Capitol and on the Capitol Complex grounds. *Cf. id.* at 492–93. Unlike in *Clark*, the bans not only limit Plaintiffs' manner of demonstrating but also affect Plaintiffs' ability to engage in any form of demonstration—indeed any expression at all—at the Capitol and on the Capitol Complex grounds. *Cf.* 468 U.S. at 297–98. Even with the state's substantial interest in public safety, the lack of narrow tailoring likely dooms the bans. This outcome is likely especially given the more rigorous standard applied to orders effectively restricting First Amendment conduct of a particular group. *Cf. Madsen*, 512 U.S. at 765. For these reasons, the Court concludes Plaintiffs have demonstrated a likelihood of success on their claims in Count II that the bans violate their exercise of First Amendment rights in a traditional public forum.

### B.     Irreparable Harm

The Court turns next to the threat of irreparable harm. "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). "The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kan. City S. Transp. Co., Inc. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1066–67 (8th Cir. 1997) (internal

quotation marks omitted) (quoting *Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)). Although the likelihood of success on the merits prong carries the most weight of the *Dataphase* factors, *see Home Instead*, 721 F.3d at 497, "[w]hen there is an adequate remedy at law, a preliminary injunction is not appropriate," *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (internal quotations marks omitted) (quoting *Gen. Motors*, 563 F.3d at 319).

Plaintiffs demonstrate a threat of irreparable harm. Plaintiffs allege since the bans have been in effect they have lost opportunities to engage in expressive activity in the Capitol and on the Capitol Complex grounds. *See* ECF No. 2-2 ¶¶ 23–26. Plaintiffs also identify protests at the Capitol they have been unable to attend or facilitate due to the bans. *See* ECF No. 2-23 ¶¶ 20–23. By its nature, the Iowa Capitol is the only forum of its kind within the State of Iowa. While there are other public parks, there is no alternative forum comparable to the Capitol Complex. *Cf. Wright*, 833 F.3d at 1297–98 (noting plaintiff was banned from one park but "free to enter the 141 other public parks in St. Peterburg"). For these reasons, the Court finds Plaintiffs demonstrate an ongoing threat of injury that "cannot be fully compensated through an award of damages." *Rogers Grp.*, 629 F.3d at 789 (internal quotations marks omitted) (quoting *Gen. Motors*, 563 F.3d at 319). Therefore, Plaintiffs demonstrate a threat of irreparable harm.

### C.    Balance of Harms

The Court next considers "the balance between th[e] harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). This factor requires examining the harm that granting or denying the injunction poses to all parties to the dispute, as well as to other

interested parties. *See Dataphase*, 640 F.2d at 113–14; *accord Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

Plaintiffs seek an injunction to stop the enforcement of bans prohibiting their entry to the Capitol and Capitol Complex grounds. Allowing the continued enforcement of the bans prevents the Plaintiffs from being able to exercise their First Amendment rights at the Capitol and on the Capitol Complex grounds for the remainder of the six-month and one-year bans. The bans provide no information regarding any process by which Plaintiffs can petition to exercise their First Amendment rights at the Capitol. *See* Pls.' Ex. A Supp. Ramus Aff., ECF No. 2-5 at 9; *cf. Wright*, 833 F.3d at 1298. There are no comparable, alternative locations at which Plaintiffs can exercise their First Amendment rights in a similar way.

In contrast, granting the injunction prevents the continued exclusion of Plaintiffs from the Capitol Complex grounds. As a result, Defendants may be harmed by Plaintiffs' return and potential engagement in unlawful conduct at the Capitol and on the Capitol Complex grounds. However, Defendants may mitigate these harms by enforcing several other criminal prohibitions to ensure safety and order in the Capitol and on the Capitol Complex grounds. There are several criminal prohibitions against unlawful behavior. These prohibitions include, but are not limited to: Iowa Code §§ 723.4 (disorderly conduct), 723.2 (unlawful assembly), and 719.1 (interference with official acts). Here, as in *McCullen*, Defendants, have "options that could serve [the State's] interest just as well, without substantially burdening the kind of speech in which [Plaintiffs] wish to engage." 573 U.S. at 490.

Defendants undoubtedly have an interest in preventing violent and unlawful conduct in the Capitol and on the Capitol Complex grounds. Because Defendants have other laws and procedures to deter and punish unlawful behavior, granting Plaintiffs' request for an injunction imposes minimal hardship on Defendants. Thus, the balance of harms weighs in favor of granting Plaintiffs'

request for a preliminary injunction.

### D.  Public Interest

Finally, the Court considers whether a preliminary injunction would serve the public interest. *Dataphase*, 640 F.2d at 113. Plaintiffs seek to exercise their First Amendment rights in a traditional public forum. Such an exercise of free expression is an essential part of our country's history and traditions. *See Summum*, 555 U.S. at 469. Protecting constitutional rights is in the public interest. *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *rev'd on other grounds sub nom. Phelps–Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc). Thus, the exercise of free expression within a traditional public forum, like the State Capitol, is in the public interest.

The public also has a significant interest in peaceful assembly, the safety of protestors, and the safety of law enforcement officers. The Court recognizes the public interest in protecting the right to freedom of expression. But in doing so, the Court does not disregard the substantial public interest in maintaining a safe environment at the Iowa Capitol Complex. This Order should not be read as providing this Court's imprimatur on the violent and assaultive conduct depicted in Defendants' video exhibits. Further, this Order does not in any way diminish the Iowa State Patrol's authority and responsibility to continue enforcing the laws of the State of Iowa in the Capitol and on the Capitol Complex grounds.

In light of the other available means to achieve the public interests in peaceful assembly and public safety, the Court finds this factor weighs in favor of granting Plaintiffs' motion for a preliminary injunction.

### VI.  CONCLUSION

Applying the four *Dataphase* factors, the Court concludes Plaintiffs' request for a preliminary injunction is warranted. Plaintiffs have demonstrated a fair chance of prevailing on

their claims in Count II for violations of their First Amendment rights in a traditional public forum. The Court finds the bans likely burden more speech than is necessary to achieve the significant state interests of preventing violence and ensuring public safety. The bans provide no process by which Plaintiffs can petition to exercise their First Amendment rights at the Capitol or on the Capitol Complex grounds. Plaintiffs have also demonstrated a threat of irreparable harm that outweighs the harm an injunction would cause Defendants. Finally, the public interest favors Plaintiffs' requested injunction.

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, ECF No. 2, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Stephan K. Bayens, Defendant Steve Lawrence, Defendant Tyson Underwood, Defendant Durk Pearston, Defendant John Doe #1, and their officers, agents, servants, employees, and attorneys, are enjoined from enforcing the oral and written bans issued in response to incidents on July 1, 2020, that prohibit Plaintiff Jalesha Johnson, Plaintiff Louise Bequeaith, Plaintiff Brad Penna, Plaintiff Brandi Ramus, and Plaintiff Haley Jo Dikkers from entering the Iowa State Capitol and Capitol Complex grounds.

When issuing a preliminary injunction, the Court must require the moving party to provide a bond or security. Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). A district court has "much discretion" in establishing a bond but must not "abuse[ ] that discretion due to some improper purpose," must "require an adequate bond," and must "make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991); *accord Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043. "Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the

defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 769 (D. Minn. 2018) (internal quotation marks omitted) (quoting *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043).

Neither party addresses the issue of a bond. Further, neither party identifies potential monetary damages resulting from issuing the preliminary injunction. For these reasons, the Court exercises its discretion to waive the bond requirement under Rule 65(c).

**IT IS SO ORDERED**

Dated this 10th day of December, 2020.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE